## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| JANE DOE (F.A.P.), an individual,<br><br>Plaintiff,<br><br>v.<br><br>EUROPEAN INVESTMENTS, LLC,<br><br>Defendant. | Case No.  1:26-cv-2963<br><br><br><br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Jane Doe (F.A.P.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against EUROPEAN INVESTMENTS, LLC, as Defendant, and would respectfully show the Court and jury as follows:

## SUMMARY

1. Jane Doe (F.A.P.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendant and its agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act through force, fraud, or coercion. [1] Traffickers use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

1

3.    Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[2] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[3]

4.    Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[4] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[5]

5.    Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[6] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

6.    Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

---

[2] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[3] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/
[4] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[5] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).
[6] 18 U.S.C. §1591(e)(3).

7.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

8.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

9.      Jane Doe (F.A.P.) alleges that Defendant derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe (F.A.P.), with minimal risk of detection or interruption. Jane Doe (F.A.P.) further alleges that Defendant continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking at the Comfort Inn. Defendant was, therefore, knowingly receiving a benefit from participation in a venture that Defendant knew or should have known was engaged in sex trafficking.

10.     Defendant had the opportunity to prevent the severe and permanent harm that Jane Doe (F.A.P.) experienced as the result of continuous trafficking. Defendant failed to do so. Instead, Defendant recklessly and/or negligently facilitated her sex trafficking. Accordingly, Jane Doe (F.A.P.) files this lawsuit.

## **PARTIES**

11.     Plaintiff, Jane Doe (F.A.P.) is a resident of Colorado. She may be contacted through her lead counsel, whose information is contained below.

12.     Jane Doe (F.A.P.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force, fraud, or coercion, to commit a commercial sex act.

13.     The trafficking of Jane Doe (F.A.P.) occurred in or affected interstate commerce.

14.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (F.A.P.)

15.     Defendant EUROPEAN INVESTMENTS, LLC. is a limited liability company with its principal place of business in Colorado. It may be served through its registered agent, Dariusz Czyszczon, at 601 SW Frontage Rd, Fort Collins, CO 80524. At all relevant times, Defendant EUROPEAN INVESTMENTS, LLC owned, operated, controlled, managed, and/or maintained the Comfort Inn located at 601 SW Frontage Rd, Fort Collins, CO 80524.

## JURISDICTION AND VENUE

16.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

**I.      Jane Doe (F.A.P.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendant.**

18.     At the age of 15, Jane Doe (F.A.P.) ran away from home after spending her time between Colorado and New York as a result of her parents' divorce. During this vulnerable period, Jane Doe (F.A.P.) met her trafficker when he reached out to her through Facebook.  She was lured to a hotel and held captive under threat of violence and physical assault.

4

19.     Jane Doe's (F.A.P.) trafficker maintained strict control through physical abuse, verbal threats, and the presence of weapons, including guns. They even threatened the safety of her family, further reinforcing her fear and compliance.

20.     Jane Doe (F.A.P.) was groomed to be sold for commercial sex. She was not allowed to keep any of the money she made from the sexual acts she was forced to perform.

21.     Jane Doe (F.A.P.) was continuously and unlawfully trafficked at the subject Comfort Inn located at 601 SW Frontage Rd, Fort Collins, CO 80524. Jane Doe (F.A.P.) was trafficked through force, fraud and coercion by her trafficker and required to engage in numerous commercial sex acts for his financial benefit.

22.     Her trafficker engaged in a pattern of control and intimidating and threatening behavior that caused Jane Doe (F.A.P.) to believe she would face serious harm or physical restraint if she did not comply with his ongoing demand that she engage in commercial sex for his financial benefit.

23.     Jane Doe (F.A.P.)'s sexual exploitation repeatedly occurred in rooms of the subject Comfort Inn and was facilitated by Defendant EUROPEAN INVESTMENTS, LLC.

24.     There were obvious signs that Jane Doe (F.A.P.) was being trafficked at the subject Comfort Inn such that Defendant knew or, through the exercise of reasonable diligence should have known, that it was benefiting from a venture causing her sexual exploitation.

25.     Some of the obvious signs of Jane Doe (F.A.P.)'s trafficking at the subject Comfort Inn included the following:

    a.  The "Do Not Disturb" sign was displayed on the room door at all times, and housekeeping was kept out of the room for routine cleaning, towel exchange, and other standard room services, including during stays of multiple days;

b. There was heavy, short-stay foot traffic in and out of Jane Doe (F.A.P.)'s room involving men who were not hotel guests, who entered and left at unusual hours and stayed only briefly; and

c. Jane Doe (F.A.P.) and others associated with her room used illicit drugs.

26. At all relevant times, Defendant owned, operated, managed, and controlled the subject Comfort Inn and employed the staff at the subject Comfort Inn.

27. The trafficker of Jane Doe (F.A.P.) and other sex traffickers frequently used the subject Comfort Inn for sex trafficking. There were obvious signs that Jane Doe (F.A.P.) was being trafficked at the subject Comfort Inn such that Defendant knew or, through the exercise of reasonable diligence should have known, that it was participating in a venture causing her sexual exploitation.

28. Plaintiff and her trafficker did not allow housekeeping and prevented staff from entering the room during these extended stays.

29. Jane Doe (F.A.P.) was trafficked from 2014 until 2017. She was trafficked at the subject Comfort Inn from December 31, 2014 to January 5, 2015.

**II.    Jane Doe (F.A.P.) Was a Child at the Time She Was Trafficked at the Subject Comfort Inn, and Her Status as a Minor Independently Establishes a Violation of 18 U.S.C. § 1591.**

30. At all times relevant to her trafficking at the subject Comfort Inn, Jane Doe (F.A.P.) was a child under the age of eighteen. She ran away from home at approximately fifteen years of age, was drawn into her trafficker's control during that period, and remained a minor throughout the time she was trafficked at the subject Comfort Inn.

31. Federal law affords heightened protection to child victims of sex trafficking. Under 18 U.S.C. § 1591(a), where the person caused to engage in a commercial sex act has not attained

6

the age of eighteen years, the offense is complete without any proof of force, threats of force, fraud, or coercion. For a minor victim, the victim's age alone satisfies the means element of the offense.

32.    Because Jane Doe (F.A.P.) was a minor, her trafficker violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, or soliciting her, knowing or in reckless disregard of the fact that she was under the age of eighteen and would be caused to engage in commercial sex acts independent of, and in addition to, the force, fraud, and coercion he also employed.

33.    Jane Doe (F.A.P.)'s youth was apparent and observable to those around her at the subject Comfort Inn. Under 18 U.S.C. § 1591(c), where a person had a reasonable opportunity to observe the minor, knowledge or reckless disregard of the victim's age need not be separately proven. Defendant, acting through the staff at the subject Comfort Inn, had repeated and direct opportunities to observe Jane Doe (F.A.P.) (including at check-in, in common areas and corridors, and during the recurring refusal of housekeeping services to her room) and through those observations had a reasonable opportunity to observe that she was a child.

34.    The indicators that Jane Doe (F.A.P.) was a trafficked child were among the very "red flags" that Defendant was trained and equipped to recognize. She was a young girl who appeared at the subject Comfort Inn in the company of, and under the control of, a significantly older male who handled her check-in and payment and who directed a steady stream of adult male visitors to her room; this is a combination of indicators that government agencies and hospitality-industry organizations specifically identify as hallmarks of the commercial sexual exploitation of children.

35.    The commercial sexual exploitation of children is overwhelmingly concentrated in hotels, and the educational materials, toolkits, and best practices directed at the hotel industry

(including those Defendant received or had access to) squarely address the recognition of child victims.

36.     Defendant was aware, or through the exercise of reasonable diligence should have been aware, that the conditions present in connection with Jane Doe (F.A.P.)'s stays were consistent with the trafficking of a minor.

### III.    The Hotel Industry's Role in Sex Trafficking and Defendant's Knowledge of the Problem.

37.     While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendant knew or should have known regarding the trafficking at their hotel properties, trafficking activity (including the trafficking of Jane Doe (F.A.P)) was pervasive and apparent at the Comfort Inn.

38.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[7] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[8] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[9] Hotels have been found to account for over 90 percent of commercial exploitation of children.[10]

---

[7] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[8] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[10] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

39. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendant, on best practices for identifying and responding to sex trafficking.[11]

40. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[12]

41. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendant is aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

    a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b. Individuals show signs of physical abuse, restraint, and/or confinement;

    c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

---

[11] *See, e.g.*, Department of Homeland Se`curity, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf.

[12] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); *National Center for Missing and Exploited Children*, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.Texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

e.  Individuals lack freedom of movement or are constantly monitored;

f.  Individuals avoid eye contact and interaction with others;

g.  Individuals have no control over or possession of money or ID;

h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.  Individuals have few or no personal items—such as no luggage or other bags;

j.  Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.  A group of girls appears to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations.  This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.[13]

42.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[14]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

43.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that

---

[13] *Id.*

[14] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

most individuals involved in prostitution are subject to force, fraud, or coercion.[15] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

44.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendant understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendant knew or should have known that signs of commercial sex (prostitution) activity in the hotels were in fact signs of sex trafficking.[16]

45.     Defendant was aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing its hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

46.     Defendant was specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendant received training and guidance on this. Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking. Reasonable diligence required Defendant to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendant were thereby benefiting from the harboring of sex trafficking victims.

---

[15] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[16] *Id.*

47.    The most effective weapon against sexual exploitation and human trafficking is education and training.[17]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[18]

48.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel & Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained."[19]  In reference to companies like the Defendant, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

49.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo ID at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged,

---

[17] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[18] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[19] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

50.    Defendant had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to red flags of sex trafficking.

51.    Unfortunately for Jane Doe (F.A.P.), Defendant has failed, at all levels, to take appropriate action in response to its knowledge of widespread and ongoing human trafficking in its hotel. Instead, it has continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (F.A.P.)

### IV.    Sex Trafficking Has Long Been Prevalent at the subject Comfort Inn.

52.    Defendant's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendant has also known, or should have known, since well before Jane Doe (F.A.P.) was trafficked at the subject Comfort Inn, that sex trafficking was ongoing and widespread at the subject Comfort Inn.

### A.  Sex Trafficking at the subject Comfort Inn was Well Known by Defendant.

53.    Upon information and belief, Defendant monitored criminal activity occurring at the subject Comfort Inn and was aware of activity indicating commercial sex, sex trafficking, or related crimes occurring at the subject Comfort Inn.

54.    Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at the subject Comfort Inn.

55.    Despite the continually mounting evidence that sex trafficking at the subject Comfort Inn was ongoing and growing, Defendant did not change course. Defendant chose to continue earning revenue and profits from renting out space in the hotel as a venue for trafficking.

13

56.     Defendant also knew or should have known that sex trafficking was prevalent at the subject Comfort Inn.

57.     Defendant knew that the subject Comfort Inn was in a high-crime area with a known history of sex trafficking.

58.     Online reviews of the subject Comfort Inn, which upon information and belief were monitored by Defendant, establish the nature of the subject Comfort Inn's role as a venue for criminal activity, including sex trafficking.

59.     Traffickers, including Jane Doe (F.A.P.)'s trafficker, repeatedly chose to use the subject Comfort Inn for their sex trafficking activity. As such, Defendant also knew or should have known about the pervasive sex trafficking at the subject Comfort Inn based on obvious indicators of this activity.

**B.  Defendant Knew Jane Doe (F.A.P.) was Being Trafficked at the subject Comfort Inn Because of the Apparent and Obvious "Red Flags" of Sex Trafficking.**

60.     The signs that Jane Doe (F.A.P.) was being trafficked at the subject Comfort Inn were not subtle, isolated, or fleeting. They were apparent, recurring, and observable to Defendant's front-desk, housekeeping, and managerial staff.

61.     Because the staff at the subject Comfort Inn had become known among traffickers as willing to look the other way, Jane Doe (F.A.P.)'s trafficker took few precautions to disguise his role or his conduct on the property.

62.     Among other things, Defendant's staff were positioned to observe, and on information and belief did observe, the following indicators of Jane Doe (F.A.P.)'s trafficking during her recurring stays at the subject Comfort Inn:

    a.  A "Do Not Disturb" sign remained on the room door at all times, and housekeeping was kept out of the room for routine cleaning, towel exchange, and other standard services for the entire duration of stays lasting up to approximately three days.

14

Defendant's housekeeping staff were directly aware of the persistent refusal of standard services;

b. A constant flow of men who were not guests of the subject Comfort Inn came to Jane Doe (F.A.P.)'s room, stayed only briefly, and left, often at unusual hours;

c. While the johns were inside the room with Jane Doe (F.A.P.), her trafficker would linger on the premises or in the parking lot, and then return to the room once each john left. This pattern – a male occupant of a hotel room repeatedly stepping out, waiting nearby while a different man went up to the same room, and returning when that man left, over and over – was directly observable to front-desk and other staff with views of the parking lot and corridors;

d. Jane Doe (F.A.P.) and others associated with her room used illicit drugs.

e. When hotel staff saw Jane Doe (F.A.P.) anywhere on the property, she was never unaccompanied by her trafficker. She did not check in herself, did not order food herself, did not handle payment, and was never observed using the property's amenities alone;

f. During these stays, Plaintiff's trafficker exercised control over her through physical threats, those including guns.

g. There were other obvious signs of trafficking consistent with the modus operandi of her trafficker that included well known "red flags" for trafficking in a hotel.

63.     Upon information and belief, multiple employees of the subject Comfort Inn – including management-level personnel – observed and were made aware of these signs of trafficking while acting within the course and scope of their employment for Defendant.

64.     Given these obvious signs, Defendant knew or should have known about the trafficking of Jane Doe (F.A.P.) at the subject Comfort Inn based on its policy or protocol that required hotel staff to report suspected criminal activity, including sex trafficking.

V.    **Defendant Could Have Stopped Jane Doe (F.A.P.)'s Trafficking But, Instead, Facilitated It.**

65.     Defendant is responsible for the acts and omissions of all employees of the subject Comfort Inn because these acts and omissions were committed in the course and scope of

15

employment and because Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the risks, known to it, of human trafficking.

66. Defendant, including through the staff at the subject Comfort Inn, had an opportunity to and did observe the signs of widespread sex trafficking in the subject Comfort Inn and, despite this, allowed this activity to continue unabated.

67. Defendant, including through the staff at the subject Comfort Inn, had an opportunity to and did observe obvious signs that Jane Doe (F.A.P.) was being sex trafficked such that Defendant knew or should have known that Jane Doe (F.A.P.) was being sex trafficked at the subject Comfort Inn. Nonetheless, Defendant took no steps in response to these signs.

68. Defendant facilitated Jane Doe (F.A.P.)'s trafficking at the subject Comfort Inn through numerous acts and omissions, including:

> a. Adopting and enforcing training methods for hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;
>
> b. Adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;
>
> c. Adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of hotel staff related to human trafficking;
>
> d. Enabling traffickers to access ancillary services that supported trafficking activities, such as furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex;
>
> e. Providing the free Wi-Fi that Jane Doe (F.A.P.)'s trafficker used to advertise and solicit buyers to purchase commercial sex delivered by Jane Doe (F.A.P.) at the subject Comfort Inn;
>
> f. Despite mining and monetizing customer data for marketing and other purposes, Defendant further refused to expend the necessary resources to effectively educate its staff and/or implement and enforce anti-trafficking measures and reporting; and

16

g.   Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their identities and activities but, instead, could operate without concern for detection or interference by the hotel staff.

69.     By ignoring or remaining willfully blind to obvious signs of trafficking, Defendant provided traffickers a venue, with the cover of a legitimate business, where they could conduct their trafficking activities without having to expend significant efforts to avoid detection or interference.

**VI.    Defendant Retained Control Over Relevant Aspects of Operations at the subject Comfort Inn and Thus Had Both the Opportunity and Duty to Prevent Sex Trafficking at the subject Comfort Inn, including Jane Doe (F.A.P.)'s Trafficking.**

70.     Defendant retained control over the details and methods of aspects of the operation of the subject Comfort Inn that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, Defendant participated in a venture with sex traffickers who were using the subject Comfort Inn as a venue for their trafficking. Moreover, as a result of this retained control, Defendant had both the opportunity and the duty to prevent Jane Doe (F.A.P.)'s trafficking at the subject Comfort Inn.

71.     Defendant retained control over the training of the staff of the subject Comfort Inn regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If Defendant had exercised reasonable diligence in providing training, it would have prevented the subject Comfort Inn from being used to facilitate obvious and apparent sex trafficking, including the trafficking of Jane Doe (F.A.P.). By failing to take reasonable steps to provide appropriate training, despite the overwhelming evidence it had of an ongoing problem with use of the subject Comfort Inn for sex trafficking, Defendant negligently facilitated sex trafficking at the subject Comfort Inn.

17

72.     Beyond training, Defendant also retained control over the response of the subject Comfort Inn to human trafficking, including development of policies and procedures regarding detection of and response to human trafficking. By retaining control in this area, Defendant assumed a legal duty to the patrons and guests of the hotel. By failing to exercise reasonable diligence in discharge of this duty, Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (F.A.P.), at the subject Comfort Inn.

73.     At the heart of Defendant's venture with traffickers (including Jane Doe (F.A.P.)'s trafficker) is the reservation of hotel rooms. Upon information and belief, Defendant retained control over the details of reservations and check-in at the subject Comfort Inn, including controlling the prices of rooms, setting detailed policies for payment methods and identification requirements, and processing reservations and payments through systems it controlled at the property. Defendant thus directly participated, through its acts and omissions, in reserving rooms to traffickers, including Jane Doe (F.A.P.)'s trafficker. If Defendant had used reasonable diligence in setting, implementing, and enforcing appropriate policies, it would have detected Jane Doe (F.A.P.)'s trafficking and/or prevented Jane Doe (F.A.P.)'s trafficker from using its hotel rooms to sexually exploit Jane Doe (F.A.P). By failing to exercise reasonable diligence in discharge of this duty, Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (F.A.P.) at the subject Comfort Inn.

74.     Defendant retained the control to adopt and enforce policies on this subject for the subject Comfort Inn, but failed to adopt and enforce appropriate policies, which facilitated trafficking at the subject Comfort Inn and allowed Jane Doe (F.A.P.)'s trafficker to access rooms for the purpose of trafficking Jane Doe (F.A.P.).

75.    Defendant also retained control over issues related to reporting security and criminal activity, including human trafficking activity. On information and belief, Defendant adopted a policy that required staff at the subject Comfort Inn to report indicators of potential criminal activity on premises to Defendant. Based on Defendant's retained control over this area, it knew or – with reasonable diligence in implementing and enforcing its own policies – should have known that Jane Doe (F.A.P.) was being trafficked. By failing to exercise reasonable diligence in discharge of this duty, Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (F.A.P.) at the subject Comfort Inn.

76.    On information and belief, Defendant also retained control over property-specific data and customer data from the subject Comfort Inn – which it obtained by controlling the means and methods by which hotel staff recorded, stored, and reported that data – such that it knew or should have known about the ongoing trafficking that was occurring at the subject Comfort Inn during the time Jane Doe (F.A.P.) was trafficked there. However, on information and belief, Defendant was willfully blind to this data and continued to facilitate trafficking at the subject Comfort Inn by providing a venue – and associated services – where traffickers could profit from sexual exploitation with minimal risk of disruption.

77.    Defendant also retained control over the security of the subject Comfort Inn through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the subject Comfort Inn. It also collected data regarding hotel operations and customers, including names, payment information, reservation history, browsing data, and other details associated with their stay. Because Defendant retained this control, it had a duty to the patrons and visitors of the subject Comfort Inn. If Defendant had exercised reasonable care in the discharge of this duty, it would have detected and

known about Jane Doe (F.A.P.)'s trafficking and avoided facilitating it. By failing to exercise reasonable diligence in the discharge of this duty, Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (F.A.P.) at the subject Comfort Inn.

78.     Defendant also retained control over the safety and security of the experience at the subject Comfort Inn by setting up systems for customers to report issues to Defendant. Despite doing this, Defendant failed to act reasonably in response to complaints about criminal activity and sex trafficking at the subject Comfort Inn. If Defendant had acted reasonably and prudently in monitoring and responding to customer complaints, this would have reduced the rampant sex trafficking and would not have facilitated Jane Doe (F.A.P.)'s sex trafficking at the subject Comfort Inn.

79.     Defendant offered free internet service to guests at the subject Comfort Inn and retained control over the details of that internet service and policies regarding its use. Defendant knew or should have known that sex traffickers used its Wi-Fi and internet service to facilitate trafficking by advertising victims' commercial sex services. Defendant retained control over internet service and ultimately failed to enact policies to prevent Jane Doe (F.A.P.)'s trafficker from advertising commercial sex activity online and could have, with reasonable diligence, used tools to determine when the Wi-Fi at the subject Comfort Inn was being used to facilitate unlawful sexual exploitation.

80.     Based on public reporting, investigations, criminal incidents, hotel reviews and comments, and direct reporting from hotel staff and other employees of Defendant, as set out throughout this Complaint, Defendant had actual or constructive knowledge of pervasive sex trafficking at the subject Comfort Inn. Defendant, through its acts and omissions, knowingly

20

received financial benefits from activity at the subject Comfort Inn, that Defendant knew or should have known was unlawful sex trafficking.

81.     If Defendant had acted reasonably, in compliance with industry standards, and/or in compliance with its own policies and procedures, Jane Doe (F.A.P.)'s trafficking would have been prevented.

82.     In addition to Defendant's direct involvement in the venture through the means outlined above, Defendant also participated in the venture through the acts and omissions of the staff at the subject Comfort Inn, which are Defendant's employees acting within the course and scope of their employment.

83.     Upon information and belief, Defendant operated the subject Comfort Inn and directed the work of its staff, including by:

    a.  Operating the on-site reservation and check-in systems for the subject Comfort Inn;

    b.  Operating a credit card processing system at the subject Comfort Inn;

    c.  Dictating policies regarding forms of payment;

    d.  Setting prices and imposing required discounts;

    e.  Setting wages;

    f.  Making employment decisions;

    g.  Providing and requiring training for hotel employees; and

    h.  Collecting and maintaining guest data through systems used at the subject Comfort Inn.

84.     Defendant did not merely identify quality or outcome standards. Instead, it specifically directed the means and methods that the staff at the subject Comfort Inn should use for day-to-day operations and dictated many of the core tools that were required to be used to

21

conduct those operations, including the means and methods of operations that directly caused Jane Doe (F.A.P.)'s damages.

85.     Upon information and belief, Defendant had the right to and actually did enforce its control through various methods including:

     a.   Inspections of the subject Comfort Inn;

     b.   Monitoring or auditing for compliance with policies and expectations;

     c.   Directing to take specific steps to come into compliance with detailed and exacting standards; and

     d.   Mandating training and education.

86.     Defendant is vicariously liable for the acts and omissions of its employees with respect to operation of the subject Comfort Inn.

87.     In addition, Defendant participated in the venture through the acts and omissions of the staff at the subject Comfort Inn because Defendant employed the staff at the subject Comfort Inn.

88.     Upon information and belief, Defendant exercised control over the terms and conditions of employment by:

     a.   Posting jobs for the subject Comfort Inn;

     b.   Providing benefits to staff of the subject Comfort Inn;

     c.   Setting pay, pay parameters, or pay ranges for staff of the subject Comfort Inn;

     d.   Setting job qualifications;

     e.   Setting job descriptions;

     f.   Dictating staffing levels required at the subject Comfort Inn;

g.  Making hiring decisions;

h.  Providing onboarding and ongoing training; and

i.  Maintaining employment records, including training records.

89.  Defendant was the employer of the staff at the subject Comfort Inn, including for purposes of training, supervision, and discipline.

90.  In ways described more fully above, Defendant knowingly received a financial benefit from participating in a venture with what it knew or should have known was sex traffickers, including Jane Doe (F.A.P.)'s sex trafficker, as follows:

a.  Sex traffickers, including Jane Doe (F.A.P.)'s sex trafficker, frequently used the subject Comfort Inn for their trafficking because they knew that staff members would look the other way. This occurred because Defendant had (1) failed to adopt and enact policies to effectively detect sex trafficking and stop use of its facilities to facilitate that trafficking; (2) failed to use reasonable care when hiring, retaining, supervising, and training staff at the subject Comfort Inn; and (3) affirmatively adopted policies and procedures that allowed sex trafficking to flourish.

b.  Defendant participated in the venture by renting rooms to Jane Doe (F.A.P.)'s trafficker long after it knew or should have known that Jane Doe (F.A.P.) was being subjected to unlawful trafficking.

c.  Defendant offered Wi-Fi at the subject Comfort Inn, collected guest data through that Wi-Fi and through the reservation and payment process, and used that data for its own business purposes including marketing.

d.  Defendant knowingly benefited from acquiring valuable customer data when it provided free Wi-Fi to patrons at the subject Comfort Inn. Defendant profited from data collected each and every time Jane Doe (F.A.P.)'s trafficker and buyers used its free Wi-Fi to advertise and solicit Jane Doe (F.A.P.) for commercial sex at the subject Comfort Inn.

e.  Defendant knowingly benefited from allowing the ongoing use of its Wi-Fi to access websites like Backpage and other notorious sites used for the advertisement of commercial sex, knowing that if it cut off access to such pages, it would lose traffickers' and buyers' regular and profitable patronage.

f.  Defendant not only provided these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual

23

exploitation with a low risk of disruption. This was done pursuant to an implicit understanding with traffickers, which is evidenced by, among other things:

    i.    Jane Doe (F.A.P.)'s trafficker was familiar to the staff at the subject Comfort Inn;

    ii.    Jane Doe (F.A.P.)'s trafficker took no steps to conceal his activities from the staff at the subject Comfort Inn but, instead, freely made requests that would facilitate his trafficking activities without concern for detection or interference by that staff;

    iii.    Defendant participated in this venture by providing additional services to traffickers (including Jane Doe (F.A.P.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms; and

    iv.    Defendant's venture with traffickers resulted in revenue from room rentals and other incidental purchases by traffickers, including Jane Doe (F.A.P.)'s trafficker, which accrued to the benefit of Defendant. Each room rented at the subject Comfort Inn increased revenue for Defendant.

91.    Under the TVPRA, Defendant is liable for all damages a jury awards to Jane Doe (F.A.P.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking at the subject Comfort Inn.

## CAUSE OF ACTION – CIVIL SEX TRAFFICKING UNDER THE TVPRA

### I.    Beneficiary Liability Under 18 U.S.C. § 1595(a).

92.    Jane Doe (F.A.P.) is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) in that her trafficker recruited, harbored, maintained, and provided her, knowing or in reckless disregard of the fact that force, threats of force, fraud, or coercion would be used to cause her to engage in commercial sex acts. She is therefore entitled to bring a civil action under 18 U.S.C. § 1595(a).

93.    Through acts and omissions described in this Complaint, Defendant **knowingly benefited, financially and by receiving things of value, from participation in a venture** with

24

sex traffickers, including Jane Doe (F.A.P.)'s trafficker, which venture Defendant knew or should have known had engaged in acts in violation of 18 U.S.C. § 1591(a)(1) and/or 18 U.S.C. § 1591(a)(2). Defendant is therefore liable to Jane Doe (F.A.P.) as a beneficiary under 18 U.S.C. § 1595(a).

94.    Defendant's liability as a beneficiary under 18 U.S.C. § 1595(a), together with the other unlawful acts and omissions alleged in this Complaint, directly and proximately caused Jane Doe (F.A.P.) to suffer substantial physical and psychological injuries and other damages as a result of being trafficked and sexually exploited at the subject Comfort Inn.

95.    The venture in which Defendant knowingly participated and from which it knowingly benefited engaged in acts in violation of 18 U.S.C. § 1591(a) for the independent reason that it trafficked a child. Because Jane Doe (F.A.P.) was a minor, the venture's commission of a § 1591 violation did not depend on the use of force, threats of force, fraud, or coercion.

96.    Defendant knowingly benefited, financially and by receiving things of value, from its participation in that venture, which Defendant knew or should have known was engaged in the sex trafficking of a child in violation of 18 U.S.C. § 1591(a). Defendant's reasonable opportunity, through its staff, to observe Jane Doe (F.A.P.)'s youth, together with the apparent and recurring indicators of child exploitation described above, establishes that Defendant knew or should have known that the venture trafficked a minor. Defendant is therefore liable to Jane Doe (F.A.P.) as a beneficiary under 18 U.S.C. § 1595(a).

97.    Accordingly, even if a factfinder were to conclude that Jane Doe (F.A.P.) was not subjected to force, threats of force, fraud, or coercion—which she was—Defendant would remain liable under 18 U.S.C. § 1595(a) because the venture from which it knowingly benefited trafficked a child in violation of 18 U.S.C. § 1591(a).

## TOLLING OF LIMITATIONS

98.     To the extent Defendant asserts an affirmative defense of limitations, Jane Doe (F.A.P.) invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendant at the subject Comfort Inn.

99.     To the extent Defendant asserts an affirmative defense of limitations, Jane Doe (F.A.P.) also invokes the doctrine of equitable tolling. As a victim of sex trafficking, she faced extraordinary circumstances, arising through no fault of her own, that prevented her from filing this lawsuit, and those circumstances did not end more than ten years before she filed this action.

100.    While under the control of her trafficker, Jane Doe (F.A.P.) did not have the freedom or functional capacity to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Because of her trafficker's physical confinement and psychological coercion, she could not have pursued her claims despite the exercise of ordinary diligence.

101.    While under the control of her trafficker, Jane Doe (F.A.P.) was subjected to extreme psychological manipulation, coercion, and violence which produced lasting effects on her mental capacity that persisted throughout and well beyond the time she was actively trafficked. She did not want to engage in commercial sex acts, but felt as if she had no choice but to comply with her trafficker's demands. As a result of these effects, she could not—through the exercise of ordinary diligence—recognize, discover, and pursue her legal rights at an earlier time.

102.    This trafficking resulted from Defendant's facilitation of trafficking at the subject Comfort Inn and Defendant's ongoing venture with criminal traffickers. Defendant's continuous

wrongful conduct, together with Jane Doe (F.A.P.)'s trafficking-induced impairments, therefore tolls any limitations period that Defendant may assert.


## DAMAGES

103.    Defendant EUROPEAN INVESTMENTS, LLC's acts and omissions caused Jane Doe (F.A.P.) to sustain legal damages.

104.    Jane Doe (F.A.P.) is entitled to be compensated for personal injuries and economic damages, including:

a.    Actual damages (until trial and in the future);

b.    Incidental and consequential damages (until trial and in the future);

c.    Mental anguish and emotional distress damages (until trial and in the future);

d.    Lost earnings and lost earning capacity (until trial and in the future);

e.    Necessary medical expenses (until trial and in the future);

f.    Life care expenses (until trial and in the future);

g.    Physical pain and suffering (until trial and in the future);

h.    Physical impairment (until trial and in the future);

i.    Exemplary/Punitive damages;

j.    Attorneys' fees;

k.    Costs of this action; and

l.    Prejudgment and all other interest recoverable.

## JURY TRIAL

105.    Jane Doe (F.A.P.) demands a jury trial on all issues.

**RELIEF SOUGHT**

106.    WHEREFORE, Jane Doe (F.A.P.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (F.A.P.) against EUROPEAN INVESTMENTS, LLC for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (F.A.P.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

*/s/ Meagan Hassan*
**David E. Harris**
Texas Bar # 24049273
**Meagan Hassan**
Texas Bar # 24065385
**SICO HOELSCHER HARRIS, LLP**
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
dharris@shhlaw.com
mhassan@shhlaw.com

**Annie McAdams**
Texas Bar # 24051014
**ANNIE MCADAMS PC**
2900 North Loop West
Suite 1130
Houston Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
annie@mcadamspc.com

**ATTORNEYS FOR PLAINTIFF**

28